# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AUJUA L.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:24-CV-466-MAB[2] |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Aujua L. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is AFFIRMED.

## PROCEDURAL HISTORY

Plaintiff protectively filed a Title II application for a period of disability and DIB on May 26, 2021 (Tr. 200-206). Plaintiff also filed a Title XVI application for SSI on June

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (Doc. 9).

13, 2022 (Tr. 207-212). Plaintiff's applications alleged disability beginning on February 9, 2021 (Tr. 17).

Plaintiff's applications were initially denied in May 2022 and upon reconsideration in September 2022 (Tr. 59-84). Plaintiff requested a rehearing by an Administrative Law Judge (ALJ), which occurred on February 15, 2023 (Tr. 38-58, 124, 146). Following the hearing, ALJ Katherine Jecklin issued an unfavorable decision dated February 27, 2023 (Tr. 14-37). Thereafter, Plaintiff's request for review was denied by the Appeal's Council and thus, the ALJ's decision became the final agency decision (Tr. 1-13). Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision (Doc. 1).

### APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 404.1520. The first step is to determine whether the

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

claimant is presently engaged in substantial gainful activity. *Id.* at § 404.1520(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 404.1520(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 404.1250(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii), 404.1509. If the answer is no, then the claimant is not disabled. *Id.* at § 404.1520(c). If the answer is yes, the analysis proceeds to step three. *Id.* at § 404.1520(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 404.1520(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 404.1520(e). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on

the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016)

(quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to

continue performing their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer

is yes, then the claimant is not disabled. *Id.* at § 404.1520(a)(4)(iv), (f). If the answer is no,

the analysis proceeds to the final step. *Id.* at § 404.1520(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make

an adjustment to perform any other work. *Id.* at § 404.1520(a)(4)(v). If the claimant can

make an adjustment to other work, then the claimant is not disabled. *Id.* at § 404.1520(g).

Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

It is important to recognize that the scope of review is limited. "The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive[.]" 42 U.S.C. § 405(g). Thus, this Court's task is not to determine whether

Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the

ALJ's findings were supported by substantial evidence and whether any errors of law

were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme

Court defines substantial evidence as, "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire

administrative record is taken into consideration, but this Court does not reweigh

evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment

for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for
the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse
only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th
Cir. 2021) (citation and internal quotation marks omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in
formulating this Memorandum and Order. The following summary of the record is
presented in mostly chronological order and directed to the points and factual allegations
raised by Plaintiff. Specifically, because Plaintiff is challenging the ALJ's analysis of her
subjective statements, the Court's summary focuses upon those statements and related
evidence, including the evidence relied upon by the ALJ when considering Plaintiff's
subjective statements.

Plaintiff was born on June 16, 1988, and was 32 years old at her alleged disability
onset date of February 9, 2021 (Tr. 17). Prior to that date, Plaintiff worked several jobs
which were classified as a housekeeper, a short order cook, and a storekeeper (Tr. 44-45,
51-52). Plaintiff has not, however, engaged in substantial gainful activity since her alleged
onset date (Tr. 19).

On February 16, 2021, Plaintiff sought treatment at the Gateway Regional Medical
Center for shortness of breath, loss of smell and taste, nausea and diarrhea, fever, and a
cough that began after she was exposed to an individual who contracted COVID-19 (Tr.
356). Plaintiff tested positive for COVID-19 and was hospitalized for three days (Tr. 354).
Other than observing some wheezing during this initial hospitalization, Plaintiff's

physical examinations yielded normal results, and she indicated that she was feeling much better on the day of her discharge (Tr. 352-360).

Plaintiff presented to St. Louis University Hospital on February 25, 2021, because she was having increased difficulty breathing and chest pain that she rated as 10 out of 10 severity (Tr. 465-468). Plaintiff was evaluated and found to have increased work of breathing with use of accessory muscles, and shallow breaths with poor air movement (Tr. 468-470). Plaintiff received ventilation therapy (BiPAP) and several other forms of treatment and medication (Tr. 470-480). Plaintiff was discharged from the hospital six days later on March 3, 2021 (Tr. 546-549). At the time of her discharge, Plaintiff did not require supplemental oxygen but was prescribed a heavy duty wheeled walker and a bedside commode (Tr. 549).

Plaintiff had telephone visits with her primary care physician, Dr. Leyland Thomas, on March 11 and 29, 2021 (Tr. 413-419). At those visits, she reported continued muscle weakness, headaches, hypertension, and nosebleeds (Tr. 413-419). Subsequently, on April 9, 2021, Plaintiff was admitted to the hospital for dyspnea[4]/chest pain, generalized weakness, a dry cough, and other symptoms related to COVID-19 (Tr. 382-383). At that time, Plaintiff did not require supplemental oxygen when ambulating and was able to perform physical therapy without difficulty (Tr. 383). Plaintiff's discharge

---

[4] Dyspnea is a medical term used to describe shortness of breath. *See* WEBMD, *Dyspnea: Causes, Symptoms, and Treatment Options*, https://www.webmd.com/lung/shortness-breath-dyspnea (last visited Mar. 28, 2025).

summary from April 12, 2021, indicated that she was able to converse easily and stated her symptoms were likely due to her known COVID-19 infection (Tr. 383-389).

On April 23, 2021, Plaintiff established care with Dr. Nadeem Ahmed, a pulmonologist, due to a reported shortness of breath (Tr. 406). At that time, Plaintiff's oxygen saturation was 98% on room air (Tr. 406). Dr. Ahmed also noted that Plaintiff was morbidly obese with a body mass index ("BMI") of almost 60, and Plaintiff was encouraged to lose weight (Tr. 409).

In June 2021, Plaintiff presented herself to the hospital due to worsening chest pain which she rated as 8 on a scale out of 10 (Tr. 627). Examination notes indicated that Plaintiff's lungs were clear, but her "breath sounds diminished," although it was unclear if that was "secondary to body habitus." (Tr. 627). A computed tomography scan ("CT scan") of Plaintiff's chest was conducted, which indicated no acute pulmonary embolism and interval resolution of previous bilateral pulmonary opacities (Tr. 621).

Plaintiff had a hospital follow-up appointment with Dr. Thomas in July 2021 (Tr. 402). In those records, Dr. Thomas noted that Plaintiff was morbidly obese, weighing 377 pounds with a BMI of 60.7 (Tr. 402). Plaintiff reported increased skin sensitivity and fatigue, but Dr. Thomas's physical examination observed no wheezing, normal breath sounds, good air movement, and no dyspnea (Tr. 405). However, Plaintiff was found to have dyspnea on exertion and was prescribed a nebulizer to be used as needed (Tr. 405).

Plaintiff visited Dr. Sarah Hartmann at the Washington University Care and Recovery from Covid Clinic in August 2021 (Tr. 636-645). At that time, Plaintiff had an oxygen saturation of 99% and a BMI of 61.17 (Tr. 636-645). Plaintiff self-reported

numerous concerns including chills, fatigue, muscle or body aches, sore throat, pain with breathing, palpitations, fast heartbeat, nausea, vomiting, abdominal pain, joint pain, swollen lymph nodes, numbness or tingling, loss or change in sense of taste, weight gain, loss or change in appetite, difficulty concentrating, memory problems, dizziness, the inability to be active, difficulty sleeping, and a change in mood (Tr. 637). Dr. Hartmann diagnosed Plaintiff with a history of COVID-19 and "post-viral disorder." (Tr. 640).

In November 2021, Plaintiff had a consultative examination with Dr. Adrian Feinerman at the request of the Bureau of Disability Determination Services for the purpose of evaluating her allegation of disability (Tr. 659). Dr. Feinerman noted that Plaintiff had a walker for balance and complained of shortness of breath that worsened with activity and improved with the use of an inhaler (Tr. 659). Dr. Feinerman conducted a physical examination and observed that Plaintiff's lungs were clear, and no wheezes occurred (Tr. 664). Additionally, an examination of Plaintiff's musculoskeletal system indicated that Plaintiff was able to ambulate 50 feet without an assistive device and had no difficulty getting on or off the exam table, tandem walking, standing on toes or heels, squatting and rising, or rising from a chair (Tr. 664-665). Dr. Feinerman also specifically marked that there was no need/use of an assistive device (Tr. 665). Plaintiff's muscle strength was normal throughout, her fine and gross manipulation were normal, and she was able to dress and undress (Tr. 665).

In January 2022, Plaintiff returned to Dr. Thomas for a follow-up visit (Tr. 680). At that time, her BMI was reported as 61.5 and her oxygen saturation was 98% (Tr. 680). Plaintiff reported 9 out of 10 chest pain, but Dr. Thomas's physical examination found

she was not in acute distress (Tr. 683). Furthermore, examination showed clear lungs, no wheezing, no rales/crackles, no rhonchi, normal breath sounds, good air movement, and no dyspnea (Tr. 683).

In March 2022, Plaintiff presented to the emergency department at St. Louis University Hospital complaining of right ankle pain following a syncopal episode during a suspected asthma attack (Tr. 700). Plaintiff further reported that she had "blacked out" and felt lightheaded and short of breath prior to losing consciousness (Tr. 700). Plaintiff also stated that she was fainting more often since she contracted COVID-19, which had resulted in lung nodules and a pulmonary embolism (Tr. 701). However, the provider's notes specifically stated, "chart reveals no pulmonary embolism" (Tr. 701). Examination revealed no acute distress, normal pulmonary effort, a minimal inspiratory wheeze to the left lower lung field, 98% oxygen saturation on room air, and tenderness and swelling to the right foot and ankle (Tr. 702-703). Plaintiff was provided with an air-cast boot and crutches, and x-rays subsequently revealed that she had fractured her right ankle (Tr. 704-705).

In April 2022, Plaintiff met with Dr. Thomas for a checkup appointment (Tr. 889). Dr. Thomas examined Plaintiff and reported 100% oxygen saturation, no acute distress, no dyspnea or wheeze, normal breath sounds, and good air movement (Tr. 889-892). Thereafter, Plaintiff returned to St. Louis University Hospital later in April 2022 for a follow-up visit for her ankle fracture (Tr. 810). Plaintiff indicated she had returned to work on light duty in a packing job following her fall and was weight bearing as tolerated ("WBAT") in regular shoes (Tr. 810). A physical examination indicated Plaintiff was not

in acute distress and had normal respiratory effort (Tr. 812). Plaintiff met with Dr. Thomas again in June 2022 and reported right hip pain that had occurred within the last month (Tr. 885-888). Plaintiff had a BMI of 61.7 and an oxygen saturation of 98% (Tr. 885-888). Upon examination, no dyspnea or wheezing was observed, and Plaintiff had good air movement (Tr. 888).

Plaintiff presented to St. Louis University Hospital in July 2022 reporting lower back pain and vomiting (Tr. 831). Plaintiff was observed to have 96% oxygen saturation, normal pulmonary effort, no respiratory distress and normal breath sounds with no wheezing (Tr. 833). Furthermore, it was observed that Plaintiff "ambulates independently with rapid steady gait." (Tr. 833-834). Plaintiff returned to Dr. Thomas in July 2022 for another follow-up (Tr. 881). At that visit, Plaintiff had a BMI of 61.2, an oxygen saturation of 98%, and her lungs and respiration were noted as normal (Tr. 881-884).

Dr. Sam Gaines, a state agency physician, reviewed Plaintiff's medical records and Dr. Feinerman's report in May 2022 (Tr. 60-65). Dr. Gaines analyzed Plaintiff's physical residual functional capacity and concluded that Plaintiff could stand and/or walk for about 6 hours in an 8-hour workday, and was limited to occasionally carrying 20 pounds and frequently carrying 10 pounds (Tr. 62). Dr. Gaines also limited Plaintiff to occasional climbing ladders, ropes, and scaffolds, as well as frequent climbing ramps and stairs (Tr. 62). Furthermore, Dr. Gaines imposed the environmental limitation that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 63). In September 2022, state agency physician Dr. Reynaldo Gotanco reviewed Plaintiff's

updated records and Dr. Feinerman's report, and ultimately concurred in the findings and limitations imposed by Dr. Gaines (Tr. 73-74).

Moreover, several other pieces of evidence from various times were submitted as part of the evidentiary record. Dr. Thomas completed a reasonable accommodation verification form for the St. Clair County Housing Authority in March 2021 (Tr. 230-232). In that form, Dr. Thomas indicated that Plaintiff needs additional housing accommodations because he believed she is disabled and suffers from shortness of breath and fatigue which are exacerbated by climbing stairs (Tr. 231-232). Dr. Thomas followed up with the housing authority in a letter dated July 19, 2021, stating that Plaintiff's conditions are exacerbated by exposure to noxious fumes and unsanitary conditions (Tr. 233). Similarly, a letter from PA-C Hannah Willis was sent to the housing authority recommending that Plaintiff be moved to a single-story home because of her physical deconditioning and "tachycardia with exertion likely secondary to COVID-19." (Tr. 234). An email between Plaintiff and Larry McLean with the Housing Choice Voucher Program also included a statement from Mr. McLean that Plaintiff's application would be assigned "two points for being a person with a disability." (Tr. 235).

Additionally, in a narrative letter written by Dr. Thomas in June 2022, he indicated Plaintiff had been advised to limit her daily work schedule in light of an illness she had developed over the past fifteen months that had "greatly compromised her ability to work at previous normal capacity." (Tr. 829). In addition, the record contains a handicap placard application that had its medical section completed by Dr. Thomas in January 2023 (Tr. 329-330). In that section, Dr. Thomas indicated that Plaintiff had a temporary

disability, is severely limited in her ability to walk, and suffers from morbid obesity and chronic pain due to her ankle fracture (Tr. 330).

Third party function reports were also submitted by Plaintiff's mother and two of her friends (Tr. 299-303). In those reports, Plaintiff's mother and friends generally state that after Plaintiff contracted COVID-19, she needed help performing household tasks such as cooking and cleaning (Tr. 299-303). One of Plaintiff's friends also wrote that Plaintiff likely can't work a job anymore because she needs to use her breathing machine every other hour (Tr. 299). Similarly, Plaintiff's mother indicated that Plaintiff can only walk a short distance before she experiences shortness of breath and is dependent on her walker (Tr. 301).

On February 15, 2023, an evidentiary hearing was conducted telephonically before ALJ Jecklin (Tr. 38-58). At that hearing, Plaintiff testified that she is 5'8" tall and weighed 383 pounds (Tr. 46). Plaintiff stated that she had gained fifty pounds over the last two years because it had become extremely hard for her to move around (Tr. 46). Plaintiff also testified that she has a wheeled walker with a seat in her home, which she relies upon for balance, ambulation, and taking rests while doing day to day activities (Tr. 46-47). Plaintiff said that even with the assistance of her walker, she could only walk for approximately 30 seconds before needing to stop and rest (Tr. 47). She also moved to a one-story house because she was not able to climb the stairs in her old home to access her upstairs bedroom and bathroom (Tr. 48). In her new home, Plaintiff installed several grab bars so she could move around more easily, and she used a low-level tub with a shower

chair (Tr. 48). Even with those accommodations, however, Plaintiff said getting in the

shower was "pretty painful" and she tried to do it every two days (Tr. 49).

Plaintiff stated that she has an oxygen machine, but later acknowledged that the

oxygen machine was provided to her by her mother and not prescribed by a doctor (Tr.

47-50). However, she also has a nebulizer that was prescribed to her by a doctor (Tr. 50).

In relation to her ankle injury, Plaintiff testified that she fainted from a lack of oxygen

when she tried to get out of her car independently, which resulted in her breaking her

ankle (Tr. 49). Plaintiff explained that she gets very lightheaded from physical exertion

(Tr. 49). Furthermore, Plaintiff went in for treatment of her ankle just a few days before

the hearing because her ankle continued to be swollen and painful (Tr. 50).

Plaintiff also explained her work history in detail, noting that she worked full time

at St. Louis Bread Co. in 2016 and 2017, and Shop and Save in 2015 (Tr. 44-45). She testified

that she also worked as a house cleaner with her mother before her alleged onset date,

and her housekeeping work explains the gaps in her employment record because she was

typically paid "under the table" for that work (Tr. 45, 50-51).

Vocational Expert Susan Shea then testified at the hearing (Tr. 51). Ms. Shea found

that Plaintiff's prior work experiences were classified as a housekeeper (DOT No.

323.687-014), short order cook (DOT No. 313.740-014), and storekeeper (DOT No. 290.477-

014) (Tr. 51). The ALJ then asked Ms. Shea the following question:

> And Ms. Shea, would you consider an individual who is a younger
> individual, with a high school education and some college, and that past
> work that you just described. Would you first consider an individual – we'll
> start with DBS. First consider an individual who was limited to light work.
> The individual could never climb ladders, ropes, or scaffolds, could

> occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. The
> individual could perform work requiring no concentrated exposure to
> dusts, fumes, noxious odors, or poor ventilation. Let's see. And that's it for
> this one.

(Tr. 52). Ms. Shea answered that Plaintiff's past work as a housekeeper would be possible

with those limitations because it was at the light level (Tr. 53). However, Plaintiff's past

work as a cook or storekeeper would not be possible as generally performed (Tr. 53). Ms.

Shea also testified that given the limitations imposed in the ALJ's hypothetical, other light

jobs would be available including hand cleaner (DOT No. 709.687-010), production

assembler (DOT No. 706.687-010), and packing line worker (DOT No. 753.687-038) (Tr.

53).

The ALJ then asked Ms. Shea if any jobs would be available if the hypothetical

individual was limited to sedentary work as opposed to light work (Tr. 53-54). Ms. Shea

stated jobs would still be available with that additional limitation, including table worker

(DOT No. 739.687-182), machine tender (DOT No. 689.585-018), and hand assembler

(DOT No. 734.687-074) (Tr. 54). The ALJ next asked Ms. Shea if any jobs would be

available if additional limitations were imposed to allow for the hypothetical individual

to use a walker to ambulate, such that the individual had no hands available to carry or

lift anything (Tr. 54). Ms. Shea responded that no jobs would be available if those

additional limitations were imposed (Tr. 54).

Ms. Shea then explained the tolerances for time off task and absences in unskilled

work (Tr. 54-55). Specifically, when Plaintiff's counsel asked if employers would tolerate

two to three unscheduled breaks of ten minutes or longer for individuals who could not

take five minute or shorter breaks due to mobility issues, Ms. Shea indicated that such a

requirement would be preclusive (Tr. 55-56).

### THE ALJ'S DECISION

The ALJ followed the five-step analytical framework outlined above. At step one,

the ALJ determined Plaintiff has not engaged in substantial gainful activity since

February 9, 2021, Plaintiff's alleged onset date (Tr. 19). At step two, the ALJ found Plaintiff

has the severe impairments of morbid obesity and asthma/COVID-19 (Tr. 20). The ALJ

also determined that Plaintiff had been diagnosed with a right ankle fracture, respiratory

failure, mild arthritis in the lumbar spine, and tachycardia with exertion (Tr. 20).

However, those medical issues were found to be non-severe because they either failed to

meet durational requirements or lacked evidence demonstrating ongoing treatment

and/or significant related vocational limitations (Tr. 20-21).

As step three, the ALJ held that none of Plaintiff's impairments, alone or in

combination, met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart

P, Appendix 1. (Tr. 21). Before turning to step four, the ALJ analyzed Plaintiff's RFC (Tr.

21-28). Specifically, the ALJ found:

> After careful consideration of the entire record, I find that the claimant has
> the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or
> scaffolds and occasionally climb ramps and stairs, stoop, kneel, crouch, and
> crawl. She can perform work requiring no concentrated exposure to dusts,
> fumes, noxious odors, or poor ventilation.

(Tr. 21).

In reaching this conclusion, the ALJ considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence (Tr. 22). The ALJ then summarized Plaintiff's hearing testimony as to how her symptoms impaired her ability to function and conduct her daily life (Tr. 22-23). Thereafter, the ALJ held:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms her symptoms, they are not supported by the remainder of the evidence of record. More specifically, the totality of the objective medical evidence of record fails to support greater limitation than accommodated in the residual functional capacity above.

 (Tr. 23).

The ALJ explained this holding by analyzing the record at great length. First, she observed that although Plaintiff suffered initial complications related to her asthma and COVID-19, she was not prescribed supplemental oxygen and repeatedly showed good oxygen saturation levels in the months and years following her initial diagnosis (Tr. 23-24). The ALJ also explained that other than some evidence of diminished breath sounds in June 2021 and minimal inspiratory wheezing in March 2022, Plaintiff's medical records generally demonstrated that Plaintiff had good air movement, no dyspnea, clear lungs with no wheezing, normal breath sounds, and no acute distress (Tr. 23-26). However, the ALJ attempted to accommodate for Plaintiff's asthma/ongoing respiratory concerns by

including both exertional and environmental limitations that would minimize the risk of
aggravating Plaintiff's breathing (Tr. 26).

Regarding Plaintiff's use of a walker, the ALJ emphasized that records in 2021 and
2022 demonstrated that Plaintiff was not reliant on her walker outside of her home after
April 2021. For instance: (1) Plaintiff was able to perform physical therapy without
difficulty while hospitalized in February to March of 2021; (2) Plaintiff reported in April
2021 that she only used her walker at home when she felt fatigued or was walking long-
distances; (3) Plaintiff's medical records after April 2021 consistently lacked any mention
of an assistive device or abnormalities in Plaintiff's gait; and (4) Dr. Feinerman observed
in November 2021 that Plaintiff could ambulate 50 feet without an assistive device, could
perform numerous physical tasks including getting on and off the exam table,
demonstrated good strength, range of motion, and reflexes, and Dr. Feinerman
specifically marked that there was no need for an assistive device (Tr. 23-25).[5] For this
reason, the ALJ found that "the record does not support the need for or inclusion of a
walker or assistive device in the residual functional capacity." (Tr. 26). Additionally, the
ALJ took Plaintiff's obesity and its impacts on her body systems into account when
formulating Plaintiff's RFC (Tr. 26-27). Ultimately, however, the ALJ concluded that
when "considering obesity, in combination with the other conditions, the
accommodations in the residual functional capacity above are reasonable." (Tr. 27).

---

[5] The ALJ acknowledged that Plaintiff used a walker when appearing at her consultative examination with
Dr. Feinerman (Tr. 24). However, the ALJ pointed out that this was the only time this device was noted in
medical records and its necessity at that time was negated by Dr. Feinerman's findings related to Plaintiff's
ability to ambulate and perform other physical tasks (Tr. 24, 26).

Finally, the ALJ considered numerous other pieces of evidence in the record when assessing Plaintiff's RFC. For example, the ALJ acknowledged Dr. Thomas' communications to Plaintiff's housing authority, and even though the ALJ found those communications to be generally unpersuasive, she indicated they were accounted for based upon the limitations she had imposed for climbing stairs/ramps and exposure to pulmonary irritants (Tr. 28). Likewise, the ALJ indicated that she considered the statements of Plaintiff's friends and mother, which were generally consistent with Plaintiff's own statements, when formulating her RFC. Conversely, however, the ALJ found certain pieces of evidence (including a housing-related letter that described Plaintiff as disabled, a letter by Dr. Thomas stating Plaintiff was advised to limit her daily work schedule, and a handicap placard form completed by Dr. Thomas) to be unpersuasive because they relied upon different standards and impermissibly made conclusions reserved for the Commissioner (Tr. 28-29). Additionally, the ALJ reviewed the functional limitations recommended by Dr. Feinerman, Dr. Gaines, and Dr. Gotanco (Tr. 27-28). The ALJ found the evidence generally supported the doctors' findings, but she then elected to impose limitations above and beyond those recommended by those doctors because of Plaintiff's prolonged treatment for COVID-19 related issues and her morbid obesity (Tr. 27-28). The ALJ concluded by observing that "to the extent that the claimant alleges limitations greater than those set forth in the current residual functional capacity finding, I find that those allegations are not consistent with or supported by the evidence." (Tr. 29).

At step four, the ALJ determined that given Plaintiff's RFC, she could perform her past relevant work as a housekeeper and a storekeeper, as generally performed (Tr. 29). In doing so, the ALJ relied upon the Vocational Expert's job classifications and conclusion that both of those past jobs were within Plaintiff's identified RFC (Tr. 29).

Alternatively, the ALJ held that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 31). In making this determination, the ALJ again relied upon the Vocational Expert's testimony that even with the limitations imposed by Plaintiff's RFC, Plaintiff could perform other light occupations such as hand cleaner, production assembler, and packing line worker (Tr. 30). For all these reasons, the ALJ concluded that Plaintiff is "not disabled" as defined by the Social Security Act (Tr. 31).

### ISSUES RAISED BY PLAINTIFF

In her brief, Plaintiff raises the following issue:

1. SSR 16-3 requires the ALJ to evaluate the consistency between a claimant's statements and the record. The ALJ may not, however, rely solely on the lack of objective medical evidence to reject subjective statements. Lewis testified she could only walk for 30 seconds and needed significant assistance with basic activities such as bathing, dressing, and cooking. The ALJ rejected Lewis' reports because they were not supported by the objective medical evidence. Did the ALJ comply with SSR 16-3p? (Doc. 16 at p. 1).

### DISCUSSION

Plaintiff argues the ALJ erred by rejecting her subjective statements solely because they were not supported by the objective medical evidence (*see generally* Doc. 16 at pp. 6-

10). Plaintiff contends that the ALJ failed to look at the record as a whole when evaluating her subjective statements, in violation of Social Security Ruling 16-3p (*Id.*). In response, the Commissioner argues the ALJ permissibly and reasonably relied upon the objective medical evidence, as well as other evidence in the record, in discrediting Plaintiff's subjective statements (*see* Doc. 23).

SSR 16-3p explains that ALJs must follow a two-step process when evaluating a claimant's subjective symptoms. *See Conor B. v. Kijakazi*, 20 CV 3342, 2022 WL 4079461, at *8 (N.D. Ill. Sept. 6, 2022). "First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his or her symptoms. Next, the ALJ must evaluate the 'intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities.'" *Id.* (quoting SSR 16-3p). Furthermore, "[a]n ALJ must justify her subjective symptom evaluation with specific reasons supported by the record, and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, the claimant's level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." *Id.* (internal quotation marks and citations omitted).

Notably, in releasing SSR 16-3p, "the Social Security Administration announced that it would no longer assess the 'credibility' of an applicant's statements, but would instead focus on determining the 'intensity and persistence of [the applicant's] symptoms.'" *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). The Seventh Circuit has explained that this "change in wording is meant to clarify that administrative law judges

aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Id.*

Plaintiff contends the ALJ erred by rejecting her subjective statements regarding her symptoms solely because they were not supported by the objective medical evidence (*see* Doc. 16 at p. 8). Plaintiff further avers that because of the ALJ's over-reliance on the objective medical evidence, the ALJ never properly considered whether Plaintiff's subjective statements as to the intensity and persistence of symptoms were consistent with other evidence in the record, including evidence of her daily activities (*Id.*). For the reasons discussed below, the Court finds neither of these contentions have merit.

Undeniably, the ALJ found Plaintiff's statements about the intensity, persistence, and limiting effect of her symptoms to be inconsistent with the objective medical evidence in the record (*see, e.g.*, Tr. 23). *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (Approving of the ALJ's subjective statement analysis that found the claimant's "allegations of disabling limitations were also frequently inconsistent with the objective medical evidence."). The record is replete with well-developed examples of the inconsistencies between Plaintiff's subjective statements and the objective medical evidence, and the Court will not rehash them all (*see, e.g.*, Tr. 23-27). Notably, however, the ALJ's analysis did not impermissibly disregard Plaintiff's subjective statements solely because they were not substantiated by the objective medical evidence. To the contrary, consistent with the requirements of SSR 16-3p, the ALJ carefully considered the other

evidence in the record, including Plaintiff's subjective statements, when reaching a conclusion about the intensity, persistence, and limiting effects of Plaintiff's symptoms. *See Tamara M. v. Saul*, 19-2288, 2021 WL 1351442, at *4 (C.D. Ill. Mar. 1, 2021) ("Based on this evidence, the ALJ concluded that Plaintiff's subjective statements were inconsistent with the medical evidence and other evidence in the record. The court concludes that the ALJ did not make an impermissible credibility determinization or violate SSR 16-3p in his opinion.").

In this regard, an explanation of what constitutes "other evidence" under SSR 16-3p is informative. Precisely, SSR 16-3p states that other evidence "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations." SSR 16-3p then outlines each of these sources of "other evidence," first explaining that an individual's statements about his or her symptoms includes that individual's statements to medical sources, other sources, and the Social Security Administration. *Id.* Second, it notes that medical sources may offer "diagnoses, prognoses, and opinions as well as statements and medical reports about an individual's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms." *Id.* Furthermore, SSR 16-3p explains that medical source statements may also include records of treatment and "[m]edical evidence from medical sources that have not treated or examined the individual," including state agency medical consultants. *Id.* As for other, non-medical sources, this includes evidence from sources

such as "public and private agencies, other practitioners, educational personnel, non-medical sources such as family and friends, and agency personnel." *Id.* Lastly, SSR 16-3p provides that other evidence also includes the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3), including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.*

The Court has explained what is considered "other evidence" at length in order to make clear that a large portion of the evidence relied upon by the ALJ when considering Plaintiff's subjective statements was in fact "other evidence" and not "objective medical evidence."[6] This distinction is significant because Plaintiff has argued that the ALJ rejected her subjective statements and favorable third-party statements solely because they were not supported by "objective medical evidence" (*see* Doc. 16 at pp. 8-10)

---

[6] SSR 16-3p's explanation of "objective medical evidence" cites 20 C.F.R. § 404.1529. Pertinently, 20 C.F.R. § 404.1529 states that "[o]bjective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *See also Hughes v. Colvin*, 664 Fed. Appx. 587, 591 (7th Cir. 2016) ("Federal regulations define objective medical evidence to mean 'medical signs and laboratory findings,' 20 C.F.R. § 404.1512(b)(1)(i), and 'evidence from the application of medically acceptable clinical and laboratory diagnostic techniques.'").

(Seeking remand so the ALJ can evaluate Plaintiff's subjective reports "on the record as a whole and not based solely on the objective medical evidence."). However, in evaluating and finding Plaintiff's subjective statements to be inconsistent with the evidence in the record, the ALJ evaluated, referenced and relied upon both objective medical evidence and "other evidence" found in the record.[7]

To be clear, the "other evidence" in this case includes numerous pieces of evidence that are medical in nature, but not "objective medical evidence."[8] For instance, the ALJ observed (and Plaintiff's own testimony confirmed) that Plaintiff was not prescribed supplemental oxygen after being discharged from the hospital (Tr. 23, 26, 554). Consequently, the ALJ found that evidence and Plaintiff's overall treatment history, as well as the objective medical evidence of Plaintiff's consistently acceptable oxygen

---

[7] Admittedly, several of the ALJ's statements indicate that she relied more heavily on the "objective medical evidence" or "objective evidence" than evidence such as Plaintiff's testimony or third-party statements (*see, e.g.* Tr. 27). Likewise, the ALJ also noted that she had accommodated Plaintiff's subjective complaints to the greatest extent possible "consistent with the objective evidence of record." (Tr. 26). Had the ALJ simply pointed to the objective medical evidence without further explanation and analysis of the "other evidence" in the record, her decision may have run afoul of SSR 16-3p. Ultimately, however, regardless of how the ALJ labeled certain pieces of evidence, what is significant is that she discussed and carefully considered all of the evidence in the record – including both the objective medical evidence **and** the other evidence – before reaching a conclusion about the intensity, persistence, and limiting effect of Plaintiff's symptoms. *See Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("Wilder has not explained how the ALJ would have reached a different conclusion as to her residual functional capacity, even if he had not erroneously remarked that she failed to attend therapy. Because the court can 'predict with great confidence what the result of remand will be,' any error was harmless."); *Migdalia M v. Saul*, 414 F. Supp. 3d 1126, 1133 (N.D. Ill. 2019) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.") (quoting *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985)). Additionally, the ALJ's final sentence of her analysis of Plaintiff's RFC clarifies that she relied upon evidence other than just objective medical evidence (*See* Tr. 29)("[B]ased on the preponderance of the evidence, including but not limited to the objective evidence, the claimant's course of treatment, clinical signs, and medications, I find that the claimant retains the residual functional capacity for the range of work identified above.").

[8] As an example, measurements of Plaintiff's BMI, oxygen saturation, and range of motion undoubtedly constitute objective medical evidence. Meanwhile, additional portions of those same medical records such as recollections of treatment history, medical source statements, and even Plaintiff's own self-reported statements would constitute "other evidence," not objective medical evidence. *See* SSR 16-3p.

saturation levels, to be inconsistent with Plaintiff's subjective statements related to her need for oxygen and her friend's third-party statement that claimed she needed to utilize a breathing machine every other hour in her daily life (*see* Tr. 49, 299). Similarly, the ALJ found the record failed to demonstrate the need for the inclusion of a walker or assistive device in Plaintiff's RFC because, in addition to objective medical evidence evincing Plaintiff's ability to ambulate on her own (*see, e.g.*, Tr. 665), other evidence such as treatment history consistently lacked any discussion of Plaintiff appearing with a walker or of Plaintiff's need for a walker (*see* Tr. 26).

Furthermore, the ALJ considered the findings of Dr. Feinerman, Dr. Gaines, and Dr. Gotanco when evaluating Plaintiff's subjective statements and formulating Plaintiff's RFC (Tr. 27-28). SSR 16-3p provides, in pertinent part, that "State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms. We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms." Thus, the assessments of Dr. Feinerman, Dr. Gaines, and Dr. Gotanco, which the ALJ found to be somewhat persuasive for Dr. Feinerman and generally persuasive for Dr. Gaines and Dr. Gotanco, were additional evidence the ALJ permissibly relied upon when evaluating Plaintiff's subjective statements (Tr. 27-28). *See Frazier v. Berryhill*, 117CV02619JMSDLP, 2018 WL 3153522, at *6 (S.D. Ind. June 28, 2018) ("SSR 16-3p makes clear that the expert consultant evidence is another valid consideration" when evaluating a claimant's subjective statements.).

Therefore, contrary to Plaintiff's assertions, the ALJ examined the other evidence

in the record when reaching her conclusions and did not disregard Plaintiff's subjective statements solely because they were not substantiated by the objective medical evidence. *See Aimee A. v. Berryhill*, 18-2098, 2019 WL 13554477, at *3 (C.D. Ill. June 20, 2019) ("An ALJ may not discount a claimant's testimony solely because it is not substantiated by objective medical evidence. However, an ALJ may consider the lack of objective evidence in conjunction with other factors, such as the claimant's activity levels and the treatment she received to alleviate the pain or other symptoms.") (internal quotation marks and citation omitted). Moreover, an ALJ is not required to take Plaintiff's subjective statements as true in the face of conflicting medical evidence. *Charmaine R. v. Saul*, 18 C 7955, 2021 WL 83737, at *6 (N.D. Ill. Jan. 11, 2021) ("But conversely, an ALJ is not required to accept all of a claimant's subjective allegations."). Instead, "[a]ll that is required of the ALJ is that she explain her subjective symptom evaluation in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Conor B.*, 2022 WL 4079461 at *8 (internal quotation marks and citation omitted). The ALJ's subjective symptom evaluation did just that.

In fact, the ALJ's subjective symptom evaluation was rationally reached by considering both the objective medical evidence and other evidence in the record which was inconsistent with Plaintiff's subjective statements. *Jason S. v. King*, 1:22-CV-2867, 2025 WL 318357, at *3 (N.D. Ill. Jan. 28, 2025) ("The ALJ discussed all of this evidence and reasonably found it inconsistent with plaintiff's complaints of a near total inability to walk or sit for any length of time."); *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1005 (N.D. Ill.

2012) ("[A] patient's subjective complaints are not required to be accepted insofar as they

clashed with other, objective medical evidence in the record."). The ALJ comprehensively

reviewed the evidence in the record and created a logical bridge between her conclusion

and that evidence. *See James Russell S. v. Kijakazi*, 121CV00391TABJMS, 2022 WL 1401340,

at *6 (S.D. Ind. May 4, 2022) ("As previously discussed, the ALJ discounted Plaintiff's

subjective statements, and was not required to adopt limitations she found were

inconsistent with the evidence."). Additionally, the ALJ even addressed the other, non-

medical evidence that was favorable to Plaintiff and provided sufficient reasons for

finding that evidence inconsistent or unpersuasive (Tr. 28-29).[9] Nothing further was

required and the ALJ's subjective symptom analysis was not patently wrong. *Burmester*,

920 F.3d at 510 ("We may disturb the ALJ's credibility finding only if it is 'patently

wrong.'"); *McGillem v. Kijakazi*, 20-2912, 2022 WL 385175, at *3 (7th Cir. Feb. 8, 2022) (In

resolving inconsistencies, it was not "patently wrong" to give less weight to the

claimant's statements than those from the medical accounts.").

    In addition, rather than simply disavowing Plaintiff's subjective statements, the

---

[9] Plaintiff has also argued that the ALJ "never evaluated the consistency of [Plaintiff's] reported symptoms and limitations with her minimal activities." (Doc. 16 at p. 9). However, the ALJ acknowledged Plaintiff's alleged daily limitations (Tr. 22), including related statements from her friends and family (Tr. 27), and determined that they were inconsistent with the other evidence in the record (Tr. 23-27). By acknowledging the evidence related to Plaintiff's daily activities and then laying out numerous records that were inconsistent with that evidence, it cannot be said that the ALJ never evaluated Plaintiff's reported activities or their consistency with Plaintiff's own subjective statements. Instead, it is evident that the ALJ did evaluate the evidence of Plaintiff's subjective statements and daily activities, but found them to be inconsistent with the other evidence in the record. And as is discussed in the next paragraph, the ALJ even included additional limitations to account for the claimed limitations in Plaintiff's daily activities. For example, Plaintiff claimed that her ability to use stairs regularly had been diminished, and accordingly, the ALJ included additional limitations in climbing stairs when formulating Plaintiff's RFC (Tr. 28) ("I accommodated any problems with stairs in the residual functional capacity, restricting the claimant to not more than occasional.").

ALJ actually imposed additional limitations at least in part because of Plaintiff's subjective statements (*see* Tr. 27-28).[10] *See, e.g., Alan C. v. Kijakazi*, 20 C 7757, 2023 WL 2915404, at *4 (N.D. Ill. Apr. 12, 2023) (rejecting the plaintiff's claims because, even if other evidence had evinced disabling symptoms, the ALJ acknowledged that evidence and specifically accounted for those deficiencies by imposing additional limitations). In fact, although the ALJ found Plaintiff's subjective statements regarding the need of a walker to be inconsistent with the evidence in the record, the ALJ still ensured that "the claimant's subjective complaints have been accommodated to the greatest extent possible consistent with the objective evidence of record." (Tr. 26). Accordingly, the ALJ imposed limitations beyond those recommended by Dr. Feinerman, Dr. Gaines, and Dr. Gotanco (Tr. 27-28). This included limiting Plaintiff to occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling, and never climbing ladders, ropes or scaffolds – even though Dr. Feinerman, Dr. Gaines, and Dr. Gotanco did not impose as substantial restrictions (Tr. 21, 27-28). Likewise, while Dr. Gaines recommended Plaintiff

---

[10] In addition, the ALJ observed several inconsistencies in Plaintiff's subjective statements and still at least partially credit those statements. For example, the ALJ noted at least two instances where Plaintiff self-reported pain of 8 or 9 on a scale out of 10, but records indicated she presented "in no acute distress." (Tr. 24). *See AnnMarie M. v. Comm'r of Soc. Sec.*, 118CV01430JESJEH, 2020 WL 1268415, at *11 (C.D. Ill. Feb. 25, 2020) ("As for the ALJ's consideration of the numerous times Annmarie complained of high pain levels but was observed to *not* be in 'acute distress,' she cannot seriously dispute that such observations were appropriate for the ALJ to take notice of. Such objective observations are relevant to the question of symptom magnification which in turn is entirely relevant for purposes of subjective symptom evaluation."). Likewise, while Plaintiff reported that she suffered a pulmonary embolism when presenting to the hospital in March 2022, the emergency department "provider specifically noted the chart showed no pulmonary embolism." (Tr. 25). And in another instance, the ALJ noted that no reference to Plaintiff's need for a walker appeared in the records after April 2021, other than when Plaintiff used it to appear at a consultative examination in November 2021 – and records from that visit clearly showed that she could ambulate without a walker (Tr. 26). Yet, even after having observed these inconsistencies which may have hinted at symptom magnification, the ALJ still elected to impose greater limitations than those recommended by the doctors who reviewed Plaintiff's medical records.

avoid concentrated exposure to certain pulmonary irritants, the ALJ went one step further and included the limitation that Plaintiff have no exposure to those materials (Tr. 21, 27-28). *See Bridget K. v. Kijakazi*, 22-CV-00159-SPM, 2023 WL 1262753, at *6 (S.D. Ill. Jan. 31, 2023) ("The ALJ's opinion provides confirmation that she reviewed and considered the applicable reports … by indicating that she was deviating slightly by providing plaintiff with MORE, not less restrictions in the RFC determination.").

"In sum, the ALJ's subjective symptom evaluation is supported by 'specific reasons supported by the record,' and Plaintiff did not show that it was 'patently wrong.'" *Brian J. v. Saul*, 438 F. Supp. 3d 903, 910 (N.D. Ill. 2020) (quoting *Weaver v. Berryhill*, 746 Fed. Appx. 574, 579 (7th Cir. 2018)). Again, the ALJ's subjective symptom analysis considered and relied upon numerous pieces of both objective medical evidence and other evidence. Moreover, the ALJ even accounted for Plaintiff's subjective statements by imposing limitations beyond those recommended by the doctors. Accordingly, by properly considering all evidence in the record, including Plaintiff's subjective statements, the ALJ's formulation of Plaintiff's RFC was supported by substantial evidence.

## CONCLUSION

After careful review of the record as a whole and for the reasons discussed above, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits and supplemental security income is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of the Commissioner.

**IT IS SO ORDERED.**

**DATED:** March 31, 2025

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
